# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| TERRY LOCKLEAR, individually and on behalf of all others similarly situated, | Case No. |
| *Plaintiff*, | |
| v. | |
| DOW JONES & COMPANY, INC., a Delaware corporation d/b/a WALL STREET JOURNAL LIVE, | |
| *Defendant*. | |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Terry Locklear ("Locklear") brings this Class Action Complaint and Demand for Jury Trial ("Complaint") against Defendant Dow Jones & Company, Inc. d/b/a Wall Street Journal Live ("Wall Street Journal") to put an end to its unlawful practice of disclosing its users' sensitive information, and to obtain redress for such conduct. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

1

## NATURE OF THE ACTION

1.     Defendant is an international media company that publishes a variety of newspapers, newswires, and magazines. Perhaps best known for its flagship newspaper, The Wall Street Journal, Defendant also offers media to consumers via a variety of other mediums, including through its proprietary software application (the "WSJ Channel") that it developed for use with a digital streaming media device called the Roku.[1]

2.     Unbeknownst to its users, each time they use the WSJ Channel to watch the news or other media content, Defendant discloses their personally identifiable information—including a record of every video clip viewed by the user (collectively, "PII")—to unrelated third parties. In addition to demonstrating a brazen disregard for its users' privacy rights, Defendant's actions also violate the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), which prohibits companies from disclosing their customers' video viewing records to third parties without express written consent.

3.     Defendant's violations of the VPPA are particularly flagrant here, as it programmed the WSJ Channel to transmit users' PII to a third party data analytics and advertising company. The business models of such "big data" advertising

---

[1]     Roku is a digital media-streaming device that delivers videos, news, games, and other content to consumers' televisions via the Internet.

companies center on the collection of disparate pieces of uniquely identifying information and online behavioral data about individual consumers, which they then compile to form comprehensive profiles about a person's entire digital life. These profiles can then be used for targeted advertising, sold as a commodity to other data brokers, or both.

4.    In an era when the collection and monetization of consumer data proliferates on an unprecedented scale, it's important that companies are held accountable for the exploitation of their users' sensitive information. Defendant chose to disregard Plaintiff's and thousands of other users' statutorily protected privacy rights by releasing their sensitive data into the marketplace. Accordingly, Plaintiff brings this Complaint against Defendant for its intentional and unlawful disclosure of her PII in violation of the VPPA.

## PARTIES

5.    Plaintiff Terry Locklear is a natural person and citizen of the State of Georgia.

6.    Defendant Dow Jones & Company, Inc., is a corporation existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 1211 Avenue of the Americas, New York, New York 10036. Defendant conducts business throughout this District, the State of Georgia, and the

United States.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as this action arises under the VPPA. This Court has personal jurisdiction over Defendant because it conducts business in this District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

**I.     Defendant Programmed the WSJ Channel to Transmit Its Users' PII and Video Viewing Activity to a Third Party Analytics and Mobile Advertising Company Without Their Consent.**

9.     The WSJ Channel is a digital software application that allows consumers to view Wall Street Journal's news and entertainment programming on their televisions via Roku's media-streaming device.

10.     To install the application on a Roku, users must visit the Roku Channel Store—Roku's proprietary online digital media platform where users can download applications (called "channels") that allow them to view specific

4

television shows or video clips on their devices.

11.     Once downloaded and installed, and upon opening the application for the first time, the WSJ Channel presents the user with a main home screen showing a variety of video content including the "Top News" and "Top Feature[d]" clips. (*See* Figure 1, showing the WSJ Channel when first opened).



(**Fig. 1.**)

12.     At no time during this process, however, does Wall Street Journal seek or obtain the consent of the user to share or otherwise disclose his or her PII to third parties for any purpose.

> ### 1.     The WSJ Channel sends its users' video viewing activity and uniquely identifying PII to data analytics and advertising company mDialog.

13.     The WSJ Channel is organized into certain categories that are accessible through the software's main user interface. (*See* <u>Figure 2</u>, showing the WSJ Channel's graphical user interface). Users may browse around these sections to view video clips and news reports. (*See id.*)



**(Fig 2.)**

14.     Unbeknownst to its users, however, each time they view video clips or

news reports, the WSJ Channel sends a record of such activities to an unrelated third party data analytics and video advertising company called mDialog.[2] The complete record is sent each time that a user views a video clip or news report, along with the serial number associated with the user's Roku device.

## II. Data Analytics and Advertising Companies Rely on Unique Identifiers Associated with Digital Devices to Create Dossiers On Consumers and Their Digital Behaviors.

15.    Today's average consumer uses more than one device to access the Internet to do things like view digital content or make online purchases. This creates challenges for online advertisers and analytics companies. Namely, to gain a broad understanding of a given consumer's behavior across all of the devices and applications that he or she uses, these companies have to find ways to "link" their digital personas. The primary solution has been to use certain unique identifiers to connect the dots.

16.    The key to successfully tracking an individual's digital behavior is to precisely identify the person and link their activities across their devices and

---

[2]      mDialog is a data analytics and video advertising company that claims to manage, deliver and measure video advertising across IP-connected devices. The company claims to enable content providers to "[d]ynamically deliver and measure uniquely addressable advertising within linear, live and video on-demand programming...." *See* mDialog Products, https://www.mdialog.com/products.html (last accessed March 9, 2014). To accomplish this, mDialog relies on uniquely identifying information about consumers to track their behavior.

applications. To do this, mDialog relies in part on creating user identities from information supplied by device manufacturers.

17.    An example of a device manufacturer supplied user identity in the consumer electronics context is a device's serial number. That's because device serial numbers are "persistent identifiers," meaning they are unique to a specific device and remain constant for the lifetime of the user's device. In other words, once a Roku serial number is matched with an individual's identity, it's exceedingly difficult for that person to avoid being tracked via their device— making it among the most stable and reliable identifiers for a given individual.

### 1.    *mDialog and other analytics and advertising companies maintain massive digital dossiers on consumers.*

18.    Once a consumer's identity is matched with their device's serial number (or other "persistent identifier"), a wealth of extremely precise information can be gleaned about the individual. For instance, software applications that transmit a Roku's serial number along with the user's activity provide an intimate look into how the user interacts with their channels, which can reveal information such as the user's political or religious affiliation, employment information, articles and videos viewed, and even detail about the sequence of events in which the user interacts with their Roku.

19.    An excerpt from one of mDialog's marketing materials, shown in

<u>Figures 3-4</u> below, illustrates how mDialog utilizes this frightening array of

information to identify and target advertisements to specific consumers:



(**Fig. 3.**)



(**Fig. 4.**)

20. <u>Figures 3-4</u> pictorially demonstrate the precision with which

mDialog's "1 to 1 Stream Addressability" feature on its Smart Stream platform can

attribute sensitive information to individuals, and use it to deliver targeted

marketing to them.

21.     mDialog's website quotes its CEO and founder, Greg Philpott, as saying, "Individual targeting is the holy grail for advertisers on both IP-connected devices as well as traditional television."[3] The same mDialog webpage states that, "With mDialog's Smart Stream platform, content owners and service providers can configure their ad decisioning service to tailor a unique set of ads for each individual viewer."

> **2.      The President and Congress are responding to growing privacy concerns over the collection and misuse of personal information in the digital marketplace.**

22.     Concerns over the privacy risks associated with the collection and transmission of PII from digital devices to third parties is no longer just academic musing. In a recently issued sixty-two page policy memo, President Obama squarely addressed the issue, stating that there's a growing problem with consumers' privacy "in the age of the Internet, the World Wide Web and smartphones."[4] While the President's memo provided a "blueprint" for protecting

---

[3]     mDialog Press Page, http://www.mdialog.com/press.html (last accessed March 7, 2014).

[4]     Consumer Data Privacy In a Networked World: A Framework for Protecting Privacy and Promoting Innovation in the Global Digital Economy, http://www.whitehouse.gov/sites/default/files/privacy-final.pdf (last accessed March 5, 2014).

consumers' privacy, he called on Congress to take the lead and pass legislation to curb behavior related to the corporate exploitation of user data.

23.     For its part, Congress has started to take up these issues as well. In 2011, Senators Patrick Leahy and Al Franken established the United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology, and the Law that, among other things, oversees the laws and policies governing (i) the collection, protection, use and dissemination of commercial information by the private sector, including online behavioral advertising, privacy within social networking websites and other online privacy issues, (ii) privacy standards for the collection, retention, use and dissemination of personally identifiable commercial information, and (iii) privacy implications of new or emerging technologies.[5]

24.     In establishing this Subcommittee, Senator and Subcommittee Chair Al Franken noted that "[t]he boom of new technologies over the last several years has made it easier to keep in touch with family, organize a community and start a business . . . It has also put an unprecedented amount of personal information into the hands of large companies that are unknown and unaccountable to the American

---

[5]     United States Senate Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/about/subcommittees/privacytechnology.cfm (last accessed March 5, 2014).

people."[6]

25.     Members of other subcommittees have made similar remarks. In a meeting of the Subcommittee on Consumer Protection, Product Safety, and Insurance, Senator John Rockefeller noted that, "third parties use [consumer data] to target advertising on individuals . . . It is very good business, but it is very cynical. It is an abuse of that power, passing on people's profiles."[7]

26.     In response to the increased scrutiny on consumers' privacy concerns, companies are also starting to change their data collection and usage practices. For instance, in the release of Apple's most recent mobile device operating system, iOS 7, it discontinued the ability to transmit certain personally identifiable information to third parties for tracking purposes.[8]

---

[6]     Sen. Franken To Chair New Subcommittee on Privacy, Technology and the Law, http://www.franken.senate.gov/?p=hot_topic&id=1315 (last accessed March 5, 2014).

[7]     S. Hrg. 112-289, Consumer Privacy and Protection in the Mobile Marketplace, http://www.gpo.gov/fdsys/pkg/CHRG-112shrg73133/html/CHRG-112shrg73133.htm (last accessed February 17, 2014).

[8]     iOS 7 Eliminates MAC Address as Tracking Option, Signaling Final Push Towards Apple's Own Ad Identifier Technology, http://techcrunch.com/2013/06/14/ios-7-eliminates-mac-address-as-tracking-option-signaling-final-push-towards-apples-own-ad-identifier-technology/ (last accessed March 5, 2014).

27.     At the same time, and perhaps most strikingly, classified documents from the National Security Agency (NSA) reveal that the government agency targets this very information (uniquely identifying data sent from digital devices) to create detailed profiles on individuals.[9]

28.     Despite the controversy surrounding these methods of harvesting and commodifying sensitive consumer data, Wall Street Journal chose to disclose users of its WSJ Channel's sensitive information to a third party analytics and advertising company.

### III.    The VPPA's Importance in the Digital Age.

29.     When the VPPA was introduced, the late Senator Paul Simon noted that, "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes. These records are a window into our loves, likes, and dislikes." S.Rep. No. 100-599 at 7–8 (1988). Senator Patrick Leahy, one of the original drafters of the VPPA, also remarked that, "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 8.

---

[9]     Spy Agencies Scour Phone Apps for Personal Data, http://www.nytimes.com/2014/01/28/world/spy-agencies-scour-phone-apps-for-personal-data.html#document/p10/a142016 (last accessed February 17, 2014).

30.     While these statements rang true in 1988 when the act was passed, the need for legislation like the VPPA in the modern computing era is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized this point, saying that, "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[10]

31.     Likewise, Senator Al Franken summed up the importance of the VPPA in today's world as follows: "[i]f someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."

## IV.     Plaintiff Locklear's Experience with the WSJ Channel.

32.     Starting in November 2012, Plaintiff Locklear downloaded and began

---

[10]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary.senate.gov/hearings/hearing.cfm?id=f14e6e2889a80b6b53be6d4e412d460f (last accessed February 17, 2014).

using the WSJ Channel on her Roku media-streaming device to watch Wall Street Journal's video clips and news stories.

33.     At all times relevant, Locklear did not consent, agree, or otherwise permit Wall Street Journal to disclose her PII to any third party analytics or advertising companies.

34.     Likewise, Locklear has never been given the opportunity to prevent the WSJ Channel from disclosing her PII to third parties.

35.     Nevertheless, each time Locklear viewed a video clip using the WSJ Channel, Wall Street Journal disclosed her PII to third party analytics and advertising company mDialog.

## CLASS ALLEGATIONS

36.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who used the WSJ Channel to watch videos and who had their PII transmitted to mDialog.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's

immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

37. **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals. Class members can be easily identified through Defendant's records.

38. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

a) Whether Defendant, through the WSJ Channel, unlawfully disclosed and continues to unlawfully disclose its users' personally identifiable information, including their video viewing records, in violation of 18 U.S.C. § 2710(b);

b) Whether Defendant knowingly violated the VPPA;

c) Whether Defendant disclosed Plaintiff and Class members'

16

personally identifiable information without their consent; and

d)      Whether Defendant violated Plaintiff and Class members' right

to privacy.

39.    **Typicality**: Plaintiff's claims are typical of the claims of the other

members of the Class. Plaintiff and the Class sustained damages as a result of

Defendant's uniform wrongful conduct during transactions with Plaintiff and the

Class.

40.    **Adequate Representation**: Plaintiff will fairly and adequately

represent and protect the interests of the Class, and has retained counsel competent

and experienced in complex litigation and class actions. Plaintiff has no interests

antagonistic to those of the Class, and Defendant has no defenses unique to

Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this

action on behalf of the members of the Class, and have the financial resources to

do so. Neither Plaintiff nor her counsel has any interest adverse to those of the

other members of the Class.

41.    **Policies Generally Applicable to the Class**: This class action is

appropriate for certification because Defendant has acted or refused to act on

grounds generally applicable to the Class as a whole, thereby requiring the Court's

imposition of uniform relief to ensure compatible standards of conduct toward the

members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. Defendant has acted and failed to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Class. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same, resulting in injury to the Plaintiff and to all of the other members of the Class. Plaintiff and the members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct.

42.   **Superiority**:  This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendant. Even if

members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

43.    Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## FIRST CAUSE OF ACTION
### Violations of 18 U.S.C. § 2710
### (On behalf of Plaintiff and the Class)

44.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

45.    Defendant is a "video tape service provider[]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery or prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), because it provides video (*i.e.*,

"similar audio visual materials" under the VPPA's definition) to consumers via its WSJ Channel.

46.   Plaintiff is a "consumer" as defined by the VPPA because she downloaded, installed, and watched videos using the WSJ Channel. 18 U.S.C. § 2710(a)(1). Under the Act, this means that she was a "subscriber" of "goods or services from a video tape service provider." *See id*.

47.   While the WSJ Channel was installed on her Roku, Plaintiff viewed numerous video clips using the channel. During these occasions, the WSJ Channel sent Plaintiff's PII—including her device's serial number and records identifying the videos that she viewed—to the third party analytics and advertising company mDialog.

48.    The WSJ Channel's transmissions of Plaintiff's PII to mDialog constitute "knowing[] disclosures" of Plaintiff's "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

49.   Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The definition's usage of the word "includes" means that a more expansive reading of the term was expressly contemplated.

50.    The National Institute of Standards and Technology ("NIST") defines "personally identifiable information" as "any information that can be used to distinguish or trace an individual's identity."[11] As described in detail in Section II above, Plaintiff's PII transmitted to mDialog from the WSJ Channel can be used to distinguish or trace her identity.

51.    At no time did Plaintiff ever provide Wall Street Journal with any form of consent—either written other otherwise—to disclose her PII to third parties.

52.    Nor were Wall Street Journal's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the WSJ Channel's disclosures to mDialog (an analytics and advertising company) were not necessary for "debt collection activities, order fulfillment, request processing, [or] the transfer of ownership." 18 U.S.C. § 2710(a)(2).

53.    As a result of Defendant's unlawful disclosures, Plaintiff and the Class have had their statutorily defined right to privacy violated. Plaintiff seeks an injunction to prohibit Wall Street Journal from releasing her and the Class's PII in the future, as well as the maximum statutory and punitive damages available under

---

[11]    NIST Guide to Protecting the Confidentiality of Personally Identifiable Information (PII), http://csrc.nist.gov/publications/nistpubs/800-122/sp800-122.pdf (last accessed February 17, 2014).

the VPPA. 18 U.S.C. § 2710(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Terry Locklear, on behalf of herself and the Class, respectfully requests that this Court enter an order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Terry Locklear as Class Representative, and appointing her counsel as Class Counsel;

B.      Declaring that Defendant's actions, as set out above, violate the VPPA, 18 U.S.C. § 2710;

C.      Awarding injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.      Awarding damages, including statutory damages of $2,500 per violation, and punitive damages, where applicable, in an amount to be determined at trial pursuant to 18 U.S.C. § 2710(c);

E.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.     Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**TERRY LOCKLEAR**, individually and on behalf of all others similarly situated,

Dated: March 13, 2014                By: /s/Jennifer Auer Jordan
                                              One of Plaintiff's Attorneys

Jennifer Auer Jordan
Georgia Bar No. 027857
jennifer@thejordanfirm.com
THE JORDAN FIRM, LLC
1447 Peachtree Street, N.E., Suite 880
Atlanta, Georgia 30309
Tel: 404.445.8400
Fax: 404.445.8477

## LOCAL RULE 5.1 CERTIFICATION

I, Jennifer Auer Jordan, hereby certify that on March 13, 2014, I filed the above and foregoing ***Class Action Complaint and Demand for Jury Trial*** with the Clerk of the Court and that such paper complies with Local Rule 5.1 and was prepared using a typeface of 14 points in Times New Roman.

<u>/s/Jennifer Auer Jordan</u>