# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TERRY LOCKLEAR, individually and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| *v.* | ) ) | Case No. 1:14-cv-00744-SCJ |
| DOW JONES & COMPANY, INC., | ) ) ) | |
| *Defendant.* | ) ) ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

**INTRODUCTION** ........................................................................ 1

**FACTUAL AND PROCEDURAL BACKGROUND** ........................................... 3

**ARGUMENT** ............................................................................ 4

    **I.**     **Legal Standard.** ............................................................ 4

    **II.**     **Locklear Alleges that Dow Jones's Disclosure of Her PII to mDialog Identified Her as Viewing Specific Video Materials.** ...... 5

        **A.**   The VPPA's Definition of PII is Broad, and the Context-Based, Case-by-Case Analysis it Requires Supports the Conclusion that Locklear's Roku Serial Number and Video Viewing History are PII. ........................................... 6

        **B.**   The Context of Dow Jones's Disclosures: Locklear Alleges Sufficient Facts to Suggest that the Roku Serial Number and Video Viewing History Disclosed by Dow Jones is PII in this Case. ................................................................ 9

        **C.**   Dow Jones's Cited Authorities Do Not Warrant a Finding that Its Disclosures Were Not Personally Identifying. ............. 11

    **III.**    **Locklear falls within the VPPA's definition of a "consumer" because she downloaded, installed and watched video content through the WSJ Channel on her Roku device.** ........................... 19

        **A.**   As a WSJ Channel Subscriber, The VPPA Protects Locklear. ................................................................ 19

        **B.**   Furthermore, because Dow Jones provided Locklear a temporary license to access and view videos in exchange for being exposed to advertisements, Locklear is also a "renter" of those videos. ...................................................... 21

i

**IV.    Locklear Suffered an Injury in Fact in the Form of Dow Jones's Disclosure of her PII to mDialog and Therefore, has Standing to Sue.**................................................................. 23

    **A.**    Dow Jones's Violation of Locklear's Statutorily Created Privacy Rights Under the VPPA is Alone Enough to Establish Standing................................................................. 24

    **B.**    Locklear Alleges that She *Was* Personally Identified as a Result of Dow Jones's Disclosures, She has Suffered Actual, Rather than Speculative, Injuries, and has Standing to Sue..... 29

**CONCLUSION** ................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES:**

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007)................................................ 5

*Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138 (2013) ......................................... 29

*Erickson v. Pardus*, 551 U.S. 89 (2007) .................................................................. 5

*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998).............................................. 25

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).................................. 24, 25

*Linda R.S. v. Richard D.*, 410 U.S. 614 (1973) ....................................................... 24

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ 29

*Warth v. Seldin*, 422 U.S. 490 (1975)............................................................... 24, 25

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*In re Carter*, 553 F.3d 919  (6th Cir. 2009)............................................................ 25

*Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*,
    104 F.3d 1256 (11th Cir. 1997) ...................................................................... 5

*Graczyk v. West Pub. Co.*, 660 F.3d 278 (7th Cir. 2011) ....................................... 27

*Grossman v. Nationsbank, N.A.*, 225 F.3d 1228 (11th Cir. 2000)..................... 5, 12

*Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323 (11th Cir. 2013)............... 24

*Klimas v. Comcast Cable Comm.*, 465 F.3d 271 (6th Cir. 2006) .................... 15, 27

*Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289 (7th Cir. 2000) ..... 25, 27, 28

*Pruitt v. Comcast Cable Holdings*, 100 F. App'x 713 (10th Cir. 2004)........... 14, 15

*United States v. Frank*, 599 F.3d 1221 (11th Cir. 2010) ....................................... 20

*United States v. Weiss*, 467 F.3d 1300 (11th Cir. 2006)........................................ 30

**UNITED STATES DISTRICT COURT CASES:**

*Citarella v. Goldleaf Fin. Solutions, Inc.*,
   No. 08-cv-2204, 2009 WL 3029760 (N.D. Ga. 2009) ................................... 5

*In re Hulu Privacy Litig.*,
   No. 11-03764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012).............. 20, 21

*In re Hulu Privacy Litig.*,
   2013 WL 6773794 (N.D. Cal. Dec. 20, 2013) .......................... 26, 27, 28, 29

*In re Hulu Privacy Litig.*,
   No. 11-cv-3764, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... *passim*

*Johnson v. Microsoft*,
   No. 06-cv-900, 2009 WL 179440 (W.D. Wash. June 23, 2009).................. 15

*Kean for Cong. Comm. v. Fed. Election Comm'n*,
   398 F. Supp. 2d 26 (D.D.C. 2005)................................................................. 24

*Klimas v. Comcast Cable Comm'ns., Inc.*,
   No. 02-cv-72054, 2003 WL 23472182 (E.D. Mich. July 1, 2003) .. 14, 15, 25

*Lane v. Wells Fargo Bank, N.A.*,
   2010 WL 2724084 (N.D. Ga. July 7, 2010) ........................................ *passim*

*Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012)...................... 12, 13

*In re Nickelodeon Consumer Privacy Litig.*,
   MDL No. 2443, (SRC), Dkt. No. 65 (N.D.N.J. July 2, 2014).......... 16, 17, 18

*Sterk v. Best Buy Stores, L.P.*,
    No. 11-cv-1894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012).................... 27

*Sterk v. Redbox Automated Retail, LLC*,
    No. 11-cv-1729, 2013 WL 4451223 (N.D. Ill. Aug. 16, 2013)................... 28

*Terrell v. U.S.*,
    2005 WL 3262966 (N.D. Ga. Nov. 30, 2005)......................................... 5, 6

*Viacom Int'l v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008)........................... 13

## STATUTES:

Fed. R. Civ. P. 12 ...................................................................................... 5

18 U.S.C.A. § 2710.............................................................................. *passim*

## MISCELLANEOUS:

Antonin Scalia, *The Doctrine of Standing as an Essential Element of the
    Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983) .......................... 24

Black's Law Dictionary (3rd Pocket Ed. 2006)...................................... 21

Encyclopedia.com, http://www.encyclopedia.com/topic/subscribe.aspx ............... 20

Findmewords.com,
    http://www.findmewords.com/definition-of-subscribing.html .......... 20

Oxford Dictionaries,
    http://www.oxforddictionaries.com/definition/english/subscribe ............... 20

Oxford Dictionaries,
    http://www.oxforddictionaries.com/us/definition/american_english/rent?
    q=rent................................................................................................... 21

S. Rep. No. 100-599 (1988)............................................................... *passim*

## INTRODUCTION

In addition to publishing the *Wall Street Journal*, Defendant Dow Jones & Company, Inc. ("Dow Jones") allows its customers to access its content on their computers (through its website), mobile devices (through its mobile application), and televisions, through content streaming devices. On the content streaming device Roku, Dow Jones offers a streaming news "channel," known as Wall Street Journal Live (the "WSJ Channel" or the "Channel"), through which a consumer can use the Channel to view news and entertainment media on his or her television.

Unfortunately for those consumers, however, each time they watch videos through the Channel, Dow Jones discloses their Roku serial numbers (unique numbers associated with their specific Roku devices) and video viewing histories to analytics and advertising company mDialog Corporation ("mDialog"). When disclosed to mDialog—a company whose core business identifies and targets specific consumers using usernames, usage information, and other identifiers—this information identifies specific individuals as having viewed specific videos.

Plaintiff Terry Locklear ("Locklear") alleges that she subscribed to the Channel and that Dow Jones disclosed her Roku serial number and video viewing history to mDialog without authorization. In response, she filed the instant action and later, her Amended Complaint ("Complaint") on behalf of herself and all other

1

subscribers to the Channel, alleging that Dow Jones violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710, which expressly prohibits such disclosures of personally identifiable information ("PII").

Dow Jones now seeks dismissal for three reasons. First, it argues that Locklear fails to state a claim because the Roku serial numbers disclosed to mDialog do not name specific individuals and therefore are not PII under the VPPA. Second, it argues that Locklear is neither a "subscriber" of the WSJ Channel nor a "renter" of its video materials, and therefore is not a "consumer" protected by the VPPA. And finally, it contends that Locklear did not suffer injury-in-fact sufficient to confer Article III standing to sue.[1] Each challenge fails.

First, Locklear's Complaint details how, as part of its core business, mDialog links Roku serial numbers with third party identities, location information, and demographic details to identify and track consumers across multiple devices and platforms. At this stage, these allegations are entitled accepted as true and viewed in light of all reasonable inferences drawn in Plaintiff's favor. As a result, Plaintiff has properly alleged that mDialog received

[1]    Dow Jones also argues in a footnote that the "Amended Complaint is doomed in any event," under an exception to the VPPA that it plans to raise at summary judgment. (MTD at 20 n. 11.) At the pleading stage, Locklear is not required to disprove Dow Jones's merits defenses, thus its additional commentary in this regard can be ignored.

data from Dow Jones that identified Locklear as having viewed specific videos.

Second, under the relevant authority and common usage of the term, Locklear sufficiently alleges that she was a "subscriber" of the Channel because she downloaded, installed, and used it to watch videos. Further, Locklear has alleged that she was a "renter" because in exchange for a temporary license to watch Dow Jones's videos, she was exposed to advertisements that resulted in Dow Jones receiving additional revenue.

Finally, by alleging that Dow Jones violated her right to privacy in her video viewing records, Locklear alleges an injury-in-fact sufficient to confer Article III standing to sue. She is not required to allege anything further.

For these reasons and as explained further below, the Court should deny Dow Jones's motion in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

Dow Jones, best known for its weekly newspaper, *The Wall Street Journal*, also offers the Channel for use on Roku streaming devices. (Compl. ¶ 1.) Through the Channel, consumers can "view video clips and news reports." (*Id.* ¶ 13.) Dow Jones never seeks or obtains consumers' consent to disclose their personally identifiable information. (*Id.* ¶ 12.)

Each time a consumer watched a video on the Channel, however, the

Channel disclosed that activity to mDialog. (*Id*. ¶ 14.) mDialog's model focuses on "attribut[ing] sensitive information to individuals, and us[ing] it to deliver targeted marketing" to those individuals. (*Id*. ¶ 23.) According to mDialog, it offers content providers the ability to "tailor a unique set of ads for each individual viewer." (*Id*. ¶ 24.) To identify individual consumers, mDialog relies on "creating user identities from information supplied by device manufacturers." (*Id*. ¶ 16.)

The records Dow Jones disclosed to mDialog included the title of each video the user watched, as well as the user's unique Roku serial number. (*Id*. ¶¶ 9–14.) Locklear alleges that upon receiving Roku serial numbers, mDialog identified the users and associated them with "demographic data related to the" Roku. (*Id*. ¶ 25.)

For her part, Locklear downloaded and used the Channel to watch videos and news reports. (Compl. ¶ 38.) Locklear never granted Dow Jones permission to disclose her PII. (*Id*. ¶¶ 12, 39, 59.) Each time she viewed contend on the Channel, however, Dow Jones disclosed her PII (in the form of her video viewing history and Roku serial number) to mDialog. (*Id*. ¶¶ 14, 34, 41.)

## ARGUMENT

## I.   Legal Standard.

On a Rule 12(b)(6) motion, the "court is required to accept as true 'all facts set forth in the plaintiff's complaint,'" and "must draw all reasonable inferences in

the light most favorable to the plaintiff." *Lane v. Wells Fargo Bank, N.A.*, No. 10-cv-1411, 2010 WL 2724084, at *1 (N.D. Ga. July 7, 2010) (quoting *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)). To survive such a motion, a complaint need not plead "[s]pecific facts," but instead, must contain a statement of the claim that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).

Under Rule 12(b)(1), "it is extremely difficult to dismiss a claim for lack of subject matter jurisdiction." *Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1260 (11th Cir. 1997). Standing challenges such as Defendant's "require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in plaintiff's complaint are taken as true for the purposes of the motion." *Terrell v. U.S.*, No. Civ.A 104CV2170EJC, 2005 WL 3262966, at *2 (N.D. Ga. Nov. 30, 2005) (internal citations and quotations omitted); *see also Citarella v. Goldleaf Fin. Solutions, Inc.*, No. 08-cv-2204, 2009 WL 3029760, at *1 (N.D. Ga. 2009).

## II.    Locklear Alleges that Dow Jones's Disclosure of Her PII to mDialog Identified Her as Viewing Specific Video Materials.

Dow Jones first argues that Locklear fails to state a claim because her Roku serial number and video viewing history are incapable of identifying her as an

individual and thus, do not constitute PII under the VPPA. Dow Jones is wrong.

A.    The VPPA's Definition of PII is Broad, and the Context-Based, Case-by-Case Analysis it Requires Supports the Conclusion that Locklear's Roku Serial Number and Video Viewing History are PII.

The VPPA defines "personally identifiable information" (or "PII") as "*includ[ing]* information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). That definition does not limit PII to traditional methods of identification like names and addresses, but instead, "plainly encompasses other means of identifying a person." *In re Hulu Privacy Litig.*, No. 11-cv-3764, 2014 WL 1724344, at **7, 11 (N.D. Cal. Apr. 28, 2014) ("*Hulu*").

Dow Jones contends that the "machine serial number" and video viewing histories it disclosed in this case is not PII and thus, does not fall within the purview of the VPPA. (MTD at 8–9.) It is wrong. Instead, the Northern District of California recently and comprehensively analyzed the meaning of "personally identifiable information" under the VPPA and found that the statutory language, legislative history, and case law confirm that a video viewing history tied to a unique identifier—like a Roku serial number—could constitute PII. *See Hulu*, 2014 WL 1724344 at *13.

The *Hulu* court began by recognizing that the VPPA does not expressly

6

address whether unique user IDs constitute PII. *See id.* at *7. Thus, it turned to the legislative history to determine Congress' intent in enacting the VPPA, which, simply put, was "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Id.* at *8 (citing S. Rep. No. 100-599, at 2 (1988)). As Senator Patrick Leahy explained,

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read . . . In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch . . . . I think that is wrong . . . and I think it is something that we have to guard against.

S. Rep. No. 100-599, at 5–6. The *Hulu* court also noted that the Senate Report includes a section-by-section analysis of the VPPA, explaining that, "[u]nlike the other definitions in this subsection, [the definition of the term 'personally identifiable information'] uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information." *Hulu*, 2014 WL 1724344 at *11. In that light, the court concluded that the VPPA does not limit identification of individuals merely to traditional methods like "a name necessarily." *Id.* ("One can be identified in many ways: by a picture, by pointing, by an employee number, by the station or office or cubicle where one works, by

telling someone what 'that person' rented."). Instead, "the statute, the legislative history, and the case law . . . require the identification of a specific person tied to a specific transaction, and support the conclusion that [although] a unique anonymized ID alone is not PII . . . *context could render it not anonymous and the equivalent of the identification of a specific person.*" *Id.* (emphasis added).

Accordingly, the court ruled that where, as here, a video service provider (like Dow Jones) discloses a unique identifier (like a Roku serial number) and video history to a third party (like mDialog), which uses that information to identify specific individuals, and the video materials they viewed, the information disclosed is PII. *Id.* at *11 ("One could not skirt liability under the VPPA, for example, by disclosing a unique identifier and a correlated look-up table.").[2]

_____

[2]     Importantly, the *Hulu* decision was on summary judgment, where the plaintiffs were no longer entitled to the presumption that their allegations were correct, and instead were required to produce evidence that the disclosures at issue identified them specifically. It was for this reason—a lack of evidence that a unique identifier had actually been tied to them specifically—that the *Hulu* Court ultimately granted summary judgment as to two types of disclosures made. *See Hulu*, 2014 WL 1724344, at **12–13. Here, by contrast, Plaintiff's allegations that mDialog actually identified her and the other Class members, (Compl. ¶¶ 3, 14, 15, 16, 17, 18, 19, 20, 21, 22, 25, 41, 54, 55, 56), must be taken as true, and can also be plausibly inferred from the nature of mDialog's business (i.e., identifying specific consumers using persistent identifiers such as Roku serial numbers (*Id.* ¶¶ 21–27)). *See Lane*, 2010 WL 2724084, at *1.

**B**.      The Context of Dow Jones's Disclosures: Locklear Alleges Sufficient
Facts to Suggest that the Roku Serial Number and Video Viewing
History Disclosed by Dow Jones is PII in this Case.

Turning to the context of the disclosures in this case, Dow Jones makes

several attacks on Locklear's allegations. First, it argues that "Locklear does not

allege there was *any* disclosure by Dow Jones of her name or any other personal

information that would identify her—or any specific person." (MTD at 8

(emphasis in original).) That argument, however, ignores the Complaint's plain

allegations, where Locklear alleges that the information disclosed by Dow Jones

actually identifies *her* as having viewed specific video materials. (*See* Compl. ¶¶ 3,

17–21, 41, 53–56.) Specifically, she alleges that Dow Jones disclosed her unique

Roku serial number and the titles of the videos she viewed on the WSJ Channel to

third-party analytics and advertising company mDialog, (*Id.* ¶ 14, 41, 53, 54.)

From there, Locklear details how mDialog "attribute[s] video records

received from the WSJ Channel to an actual individual." (*Id.* ¶ 27.) Locklear

alleges that mDialog accomplishes this by using "unique" and "persistent

identifiers," like a "[Roku]'s serial number." (*Id.* ¶ 17.) "[D]evelopers of software

for the Roku rely on the device's serial number to identify and track individual

users" like Locklear and other members of the class. (*Id.* ¶ 20.) Locklear further

explains how mDialog can "retrieve detailed demographic information about

individual consumers—simply by looking up the[ir]" Roku serial numbers—which are "unique-identifiers[.]" (*Id.* ¶ 26.)

Locklear also outlines mDialog's "method [of] collect[ing] such demographic data" using information transmitted to its servers by devices like the Roku, "such as identification of the types of video files that can be played on the device, historical usage information . . . user information . . . device capabilities, device network connection type, device network carrier . . . etc." (*Id.* ¶ 25.) Once this "demographic data [is] linked to a Roku serial number . . . it is trivial for . . . mDialog to attribute video records received from the WSJ Channel to an actual individual." (*Id.* ¶ 27.) Locklear therefore alleges that mDialog uses this information to tie each Roku serial number to "an identified person," like herself.

Further, Locklear alleges that mDialog pursues this method of identification because "[i]ndividual targeting is the holy grail for advertisers on [] IP-connected devices[.]" (*Id.* ¶ 24.) mDialog markets its identification capabilities to companies like Dow Jones, offering them the ability to "tailor a unique set of ads for each individual viewer." (*Id.*)[3]

---

[3]     Dow Jones argues in a footnote that Locklear fails to allege that it knew mDialog "could and did link Roku users' identities to a Roku serial number[.]" (MTD at 14, n. 6.) That argument, however, ignores that Dow Jones programmed (a necessarily intentional act) the Channel to transmit Locklear's Roku serial

In light of the foregoing, it is clear that Locklear alleges that when Dow Jones disclosed her Roku serial number and video viewing history to mDialog, mDialog received more than just a "unique, anonymous identifier." *Hulu*, 2014 WL 1724344, at \*14. Rather, mDialog received (and Dow Jones disclosed) information that "personally identified" Locklear as having viewed specific video materials. At this stage in the proceedings, nothing more need be pleaded.

**C.**   Dow Jones's Cited Authorities Do Not Warrant a Finding that Its Disclosures Were Not Personally Identifying.

None of Dow Jones's cited authorities require a different result, nor are they sufficient to overcome the 12(b)(6) standards, which require Plaintiff's allegations to be accepted as true and all reasonable inferences to be drawn in her favor. As an initial matter, Dow Jones mischaracterizes the Northern District of California's recent *Hulu* decision. Rather than "expressly reject[ing]" claims that disclosure of unique identifiers can be personally identifying if the recipient then correlates the identifier with a plaintiff's identity (MTD at 14), the *Hulu* Court stressed the

---

number and video viewing history to mDialog (which Dow Jones does not dispute). (Compl. at ¶¶ 1, 2, 4, 14, 34, 41, .) Further, given mDialog's public statements and business model, (*see id.* ¶¶ 21–27), it can reasonably be inferred at this stage (and determined through discovery) that Dow Jones knew or should have known that the information it disclosed was PII in this context. *See Lane*, 2010 WL 2724084, at \*1 (noting that the Court "must draw all reasonable inferences in the light most favorable to the plaintiff" on a Rule 12(b)(6) motion).

importance of the plaintiffs' failure to establish that any such correlation occurred. *See Hulu*, 2014 WL 1724344, at *12 ("At summary judgment, Hulu carried its initial burden by pointing to the absence of information that comScore correlated any information such that there is a disclosure within the meaning of the VPPA. Plaintiffs did not point to any evidence showing genuine disputes on any material fact about whether comScore did anything with the information . . . [The evidence] does not suggest any linking of a specific, identified person and his video habits."); *see also id*. at *11 ("One could not skirt liability under the VPPA, for example by disclosing a unique identifier and a correlated look-up table.") Were correlation not a basis for personal identification, the *Hulu* Court would not have gone to lengths to emphasize the lack of emphasis that any such correlation occurred.[4]

Likewise, Dow Jones's reliance on the "reverse engineering" language in *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010 (N.D. Cal. 2012) is misplaced. (*See* MTD at 15.) In *Low*, the plaintiffs alleged only that "third parties [could]

---

[4]     Again, the *Hulu* decision was on summary judgment, after the plaintiffs had a full opportunity to adduce evidence of such correlation. In this case, on the other hand, Plaintiff has alleged a plausible basis (i.e., mDialog's business model and the nature of the other information it collects) for believing that such a disclosure took place, and she is, at this stage (i.e., prior to any opportunity to take discovery) entitled to a presumption of truth in her allegations, as well as to the drawing of any necessary inferences in her favor. *See Lane*, 2010 WL 2724084, at *1 (quoting *Grossman*, 225 F.3d at 1231).

*theoretically* de-anonymize a user's LinkedIn ID number," while failing to allege "that anyone ha[d] actually done so, or what information precisely [] these third parties ha[d] obtained." *Id.* at 1025 (emphasis added). To be clear, as the *Hulu* court noted, *Low* did "not alter the conclusion that a unique anonymized ID could be PII if other evidence renders it the equivalent of identifying a specific person." *Id.* In any event, unlike the plaintiffs in *Low*, Locklear goes beyond mere speculation and expressly alleges that mDialog *does* use Roku serial numbers to identify specific individuals (Compl. ¶¶ 14–20, 23–27, 41, 54, 55), and explains *how* mDialog does so using Roku serial numbers. (*Id.* ¶¶ 14–20, 23–27.)

Similarly, Dow Jones offers *Viacom Int'l v. YouTube Inc.*, 253 F.R.D. 256 (S.D.N.Y. 2008) for the proposition that a unique identifier cannot actually identify a specific person. (MTD at 10.) As with its other arguments, however, the *Hulu* court already addressed that misstatement of *Viacom*'s holding:

> What was at issue [in *Viacom*], however, was not the users' identities. Instead, because the case was a copyright case against YouTube, what mattered was the number of times the users viewed particular videos. [*Viacom*, 253 F.R.D. at 262.] YouTube "did not refute that the login ID is an anonymous pseudonym that users create for themselves when they sign up with YouTube which *without more* cannot identify specific individuals" *Id.* at 262. (emphasis added). The Court dismissed YouTube's privacy concerns as speculative and ordered discovery. *Id.*
>
> That result makes sense: the case was about discovery to establish copyright damages, not consumers' identities. The consumer identities

13

were not relevant. Indeed, Viacom issued a press release that the parties would anonymize the data before disclosure to address YouTube users' privacy concerns. [Citation omitted.] Also, the decision does not provide enough of a factual context to determine whether the user IDs in *Viacom* identified a person or were anonymized. The case's holding is relevant only to the extent that it recognizes that unique anonymous IDs do not necessarily identify people.

*Hulu*, 2014 WL 1724344, at **9–10.

Dow Jones next relies on *Pruitt v. Comcast Cable Holdings*, 100 F. App'x 713 (10th Cir. 2004), for the proposition that device identifiers are not PII. In *Pruitt*, however, the court held that because the information at issue—unique anonymous identifiers stored in Comcast cable boxes—had not been combined with the identifying information from Comcast's own databases, it was not "personally identifying." *Id.* Thus, while "*Pruitt* stands for the proposition that an anonymous, unique ID *without* more does not constitute PII . . . it also suggests that if an anonymous, unique ID were disclosed to a person who could understand it, that might constitute PII." *Hulu*, 2014 WL 1724344, at *11 (emphasis in original) (citing *Pruitt*, 100 F. App'x. at 716). The recipient of the Roku serial numbers in this case, mDialog, can *and does* identify specific individuals using those IDs, (Compl. ¶¶ 14–20), and therefore, *Pruitt* is inapposite as well.

Dow Jones's reliance on cases involving the disclosure of IP addresses is also misplaced. (*See* MTD at 11–12) (citing *Klimas v. Comcast Cable Comm'ns.*,

14

*Inc.*, No. 02-cv-72054, 2003 WL 23472182 (E.D. Mich. July 1, 2003) *aff'd on other grounds*, 465 F.3d 271 (6th Cir. 2006); *Johnson v. Microsoft*, No. 06-cv-900, 2009 WL 179440, at *4 (W.D. Wash. June 23, 2009)). In *Klimas*, for instance, the court held that:

> [A] dynamic IP address cannot constitute PII . . . . Unlike a home address, which *for the most part* stays constant, a dynamic IP address is more like a hotel room number. Dynamic IP addresses constantly change and unless an IP address is correlated to some other information, such as Comcast's log of IP addresses assigned to its subscribers (or a hotel registry in the analogy of hotel room numbers), it does not identify a single subscriber by itself.

*Id.* at *5 (emphasis added). Likewise, in *Johnson*, the court recognized that many Internet service providers "assign dynamic IP addresses that change each time the user connects to the Internet." 2009 WL 179440, at *4. Ultimately, the *Johnson* court held that IP addresses alone, without "matching [them] to a list of a particular Internet service provider's subscribers," did not constitute PII within the meaning of the privacy policy in question. *Id*.

The Roku serial numbers in this case are not dynamic, but rather "stay[]" constant" with a user, *see Klimas*, 2003 WL 23472182, at *5, and thus are more like home addresses than hotel rooms, to extend the *Klimas* analogy. Indeed, like home addresses, while Roku serial numbers may change periodically through one's life, they are generally considered identifying during the pendency of an

individual's use. (Compl. ¶¶ 15–20.) Put another way, IP addresses regularly change and are accordingly used only to identify a specific computer at a specific time, whereas Roku serial numbers are static and for that very reason are used by entities like mDialog to identify specific individuals at specific times. (*Id.*)

Finally, on reply, Dow Jones will likely try to rely on the District of New Jersey's recent dismissal order in *In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443, (SRC), Dkt. No. 65 (N.D.N.J. July 2, 2014). There, the plaintiffs brought VPPA claims alleging that the defendant had disclosed their online usernames, IP addresses, and device identifiers to a third party. *Id.* at *22. While that decision, on its face, may appear to support Dow Jones' position that Roku serial numbers are not PII, upon closer examination, it becomes clear that the *Nickelodeon* court's reasoning—which at times, points to the Hulu's court's reasoning—actually supports Plaintiff's position here that Roku serial numbers can be considered PII.

In its discussion of the VPPA claim, the *Nickelodeon* court began by examining the statute's language, as well as the *Hulu* decision, and acknowledged that "'a person' can be identified by more than just their name and address," *id.* at *19, including "by a picture, by pointing, by an employee number, by the station or office or cubicle where one works . . . ." *Id.* (quoting *Hulu*, 2014 WL 1724344, at

16

*11).  Relying on the *Hulu* decision, the *Nickelodeon* court concluded that in order to constitute PII under the statute, "information … must, without more, itself link an actual person with actual video materials." See *Id*. ("This is a cogent and reasonable reading of the statute, which on its face establishes that PII is 'information' that itself must both 'identif[y] a person' and further identify that 'person' in connection with 'specific video materials or services' 'requested or obtained' from a VTSP.")

However, in finding that the device IDs, among other information, did not constitute PII within the meaning of the VPPA, the *Nickelodeon* court contrasted the disclosures of Facebook IDs and video viewing information *to Facebook* in the *Hulu* case (which had the effect of identifying specific video viewers), with the disclosures alleged by the plaintiffs, which failed to establish any context or other basis for finding that the information disclosed would, "without more," identify specific viewers. *See Nickelodeon*, Dkt. No. 65, at *20. While recognizing that electronic identifiers could, with context, serve to identify specific individuals in a manner "akin to" a name, the Court found that the plaintiffs in that case had failed to plead any contextual facts sufficient to support such a conclusion. *Id.* at *20–22. Ultimately, the *Nickelodeon* court applied the *Hulu* analysis, and found that due to a lack of allegations concerning context in which the information was disclosed,

the plaintiffs had only alleged disclosure of the "type of information that might one day serve as the basis of personal identification after some effort on the part of the recipient," and therefore failed to state a claim *Id.* at *22.

Here, by contrast, Plaintiff does not allege that mDialog *might* use the disclosed information to identify her. Rather, she asserts that mDialog actually used her Roku serial number as an identifier, and further that it actually does (as a known part of its business) associate the serial number with other information collected from her Roku activities to identify her. (*See* Compl. ¶¶ 16, 17, 20.) At this stage, those allegations must be taken as true, and Dow Jones's assertions to the contrary—that in actual practice, the information disclosed does not identify users—are inappropriate for resolution without discovery. *See Lane*, 2010 WL 2724084, at *1 (noting that the court "is required to accept" the allegations in the complaint "as true," and that it "must draw all reasonable inferences" in the plaintiff's favor).

Additionally, given the nature of mDialog's business and the way it operates, the disclosures alleged by Locklear are largely similar to the Facebook disclosures recognized in *Hulu* and cited favorably in *Nickelodeon*—just as Facebook's core business involves and depends on associating randomized Facebook IDs with specific individuals in a manner "akin to" a name, Locklear

18

alleges that mDialog's core business involves and depends on associating randomized device identifiers with specific individuals in a manner "akin to" a name. (Compl. ¶ 16.)

Thus, Plaintiff is not alleging that the information disclosed by Dow Jones might at some point in the future become identifying, but rather that it is identifying when disclosed to mDialog. (Compl. ¶ 20.)

*          *          *

For these reasons, the Roku serial numbers disclosed by Dow Jones allowed mDialog to identify individuals, including Locklear, as having viewed specific video materials, and are therefore, PII.

## III.   Locklear falls within the VPPA's definition of a "consumer" because she downloaded, installed, and watched video content through the WSJ Channel on her Roku device.

Dow Jones next argues that Locklear is not a "consumer" as contemplated by the VPPA because she is neither a "subscriber" nor a "renter" of "goods or services" as those terms are defined in the statute. (MTD. 16; *see also* 18 U.S.C. § 2710(a)(1) (defining "consumer" as "any renter, purchaser, or subscriber of goods or services from a video service provider[.]").) Dow Jones is wrong— Locklear is both a "subscriber" and a "renter" for purposes of her claims here.

**A.**   <u>As a WSJ Channel Subscriber, The VPPA Protects Locklear</u>.

Dow Jones first contends that Locklear is not a "subscriber" to the Channel

because she supposedly failed to allege that "she registered with Dow Jones[,]"

"established any personal user ID or profile with Dow Jones[,]" or "paid to receive

content from Down Jones[.]" (*Id.*) But, those allegations are not required to

establish that Locklear is a subscriber of the Channel.[5]

The VPPA does not define "subscriber." *See* 18 U.S.C. § 2710(a). Thus the

Court must interpret the term as it is "commonly understood" and by using its

"ordinary and plain meaning." *United States v. Frank*, 599 F.3d 1221, 1234 (11th

Cir. 2010). In the context of online services like the Channel, "subscribe" refers to

"[a]n arrangement by which access is granted to an online service."[6] The *Hulu*

court confirmed as much, finding that an online video subscriber relationship

---

[5]   On this issue, Dow Jones points to the *Hulu* decision for support. But rather
than cite the court's actual holding—i.e., that neither creation of a profile,
registration, nor payment were required to meet the definition of "subscriber"—
Dow Jones seems to rely on the court's recitation of the plaintiffs' argument
instead. *See In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8.

[6]   *See*, *e.g.*, *subscribe (1.1)*, Oxford Dictionaries,
http://www.oxforddictionaries.com/definition/english/subscribe (last accessed June
23, 2014); *subscribe*, Encyclopedia.com,
http://www.encyclopedia.com/topic/subscribe.aspx (last accessed June 23, 2014);
*subscribing (2)*, FindMe Words, http://www.findmewords.com/definition-of-
subscribing.html (last accessed June 23, 2014) ("[A]rrange for access to an
electronic mailing list or service.").

existed where plaintiffs alleged that "[t]hey visited hulu.com and viewed video contend," "regardless of whether they were registered and logged in." *See In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8. Additionally and contrary to Dow Jones's argument here, there is no requirement that a "subscriber" pay for the services in question. *Id* ("[I]f Congress wanted to limit the word 'subscriber' to 'paid subcriber,' [*sic*] it would have said so.").[7]

Here, Locklear's allegations fit the common usage of "subscribe" as used in the online video service context. Locklear alleges that she downloaded and installed the WSJ Channel (thereby entering into an agreement with Dow Jones to deliver her streaming video through the Channel) and did in fact request and receive video content delivered by Dow Jones through the Channel. (Compl. ¶¶ 38, 52.) Like the plaintiffs in *Hulu*, then, Locklear used a video streaming service—provided by Dow Jones—to view video content. (*Id*.) Thus, Locklear is a "subscriber" under the plain meaning of the term because she downloaded, installed, and used the Channel, through which video content was delivered. *See In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8; *see also* note 6, *supra*.

---

[7]     This usage of "subscribe" also fulfills the VPPA's purpose of "preserv[ing] personal privacy with respect to the . . . delivery of . . . audiovisual materials" by ensuring that the viewing records of streaming video users will have their privacy protected. S. Rep. 100-599, (1988).

Accordingly, under the facts alleged, Locklear is a "subscriber" (and therefore a "consumer") as contemplated by the VPPA.

**B.** <u>Furthermore, because Dow Jones provided Locklear a temporary license to access and view videos in exchange for being exposed to advertisements, Locklear is also a "renter" of those videos.</u>

Dow Jones also argues that Locklear is not a "renter" (and therefore, not a "consumer") of its video content because she "does not pay for the free WSJ Channel[.]" (MTD at 19–20.) That argument misses its mark too.

"Rent" commonly refers to the act of being "let or hired out at a specified rate[.]"[8] In other words, a "renter" relationship is based upon the exchange of "consideration" for the temporary use of property. Black's Law Dictionary (3rd Pocket Ed. 2006) (defining "Rent"). In line with this definition, "valuable consideration" is defined as "consideration that [] confers a pecuniarily measurable benefit on one party[.]" Black's Law Dictionary (3rd Pocket Ed. 2006). As such, to be a "renter" does not require the exchange of money, as Dow Jones argues, but rather the exchange of a benefit between the parties.

Locklear's allegations demonstrate that she is a "renter" under the common

---

[8]    *Rent (1.2)*, http://www.oxforddictionaries.com/us/definition/american_english/rent?q=rent; *see also rent (1.1)*, *id.*, (defining "rent" as an act ([o]f an owner) let[ting] someone use (something) in return for payment).

usage of the term. In particular, she alleges that when she requested to "view

specific videos" on the WSJ Channel, she was "exposed to Defendant's

advertisements" as consideration for obtaining the requested content. (Compl.

¶ 52.) Locklear was required to watch these advertisements each time she

requested video content on the Channel. (*Id.*) Thus, Locklear conferred a benefit on

Dow Jones by generating advertising revenues for it each time she requested video

content from the Channel, and in exchange for that benefit, she was "grant[ed] [] a

temporary license to access and view specific videos in exchange[.]" (*Id.*)[9]

Thus, Locklear can appropriately be considered a "renter" as well as a

"subscriber" under the VPPA.

**IV.    Locklear Suffered an Injury in Fact in the Form of Dow Jones's
        Disclosure of her PII to mDialog and Therefore, has Standing to Sue.**

Dow Jones next argues that Locklear lacks Article III standing to sue

---

[9]    Dow Jones argues that the relationship between Locklear and the Channel is
more akin to that of a viewer and provider of free broadcast television. (MTD at
20.) But, unlike a viewer of broadcast television, Locklear was able to pick and
choose *specific* video content at will in exchange for watching advertisements.
(Compl. ¶¶ 11, 13, 52.) By contrast, viewers of free broadcast television cannot
request specific content or generate a record of content watched—nor do they have
the opportunity or capability to do so. Broadcast television runs in set schedules
that are published openly and publically; viewers are bound to that schedule and
unable to deviate from it. The ability to choose specific video clips also
distinguishes the Channel from broadcast television, inasmuch as that ability
directly correlates to the creation (and ultimate disclosure) of the viewing records
that the VPPA is meant to protect. *See* S. Rep. 100-599 at *2.

because she has not alleged that she suffered any "injury in fact" as a result of its alleged conduct. In particular, it contends that the VPPA does not confer standing based on "a mere statutory violation" like that alleged by Locklear (MTD at 22), and that even if it does, Locklear has not alleged anything beyond the speculative possibility of a "potential future use[]" of the information disclosed to mDialog. (MTD at 24.) These arguments fail as well.

**A.**   Dow Jones's Violation of Locklear's Statutorily Created Privacy Rights Under the VPPA is Alone Enough to Establish Standing.

As an initial matter, it is hornbook law that violation of a substantive right, including a right conferred by statute, can, without more, can be an "injury in fact" sufficient to confer Article III standing. The Supreme Court has consistently held that "Congress can enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1330–1334 (11th Cir. 2013).[10] "Essentially, the standing question in such cases is whether the

---

[10]   *See also* Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 885 (1983) ("Standing requires . . . the allegation of some particularized injury to the individual plaintiff.

constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth*, 422 U.S. at 500; *see also In re Carter*, 553 F.3d 919, 988 (6th Cir. 2009) ("Congress no doubt has the power to create new legal rights, and it generally has the authority to create a right of action whose only injury-in-fact involves the violation of that statutory right").

Here, the VPPA expressly confers a right to privacy in the viewing of video materials, and a right of enforcement to any "person aggrieved by any act of a person in violation of" its provisions. 18 U.S.C. § 2710. Where, as here, a statute confers a substantive right and provides that a "person aggrieved" by its violation may sue, such an "aggrieved" person has "suffer[ed] an injury 'in precisely the form the statute was intended to guard against.'" *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 298 (7th Cir. 2000) (quoting *Havens*, 455 U.S. at 373); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19–20 (1998) ("History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested.").

---

But legal injury is by definition no more than the violation of a legal right; and legal rights can be created by the legislature.").

The *Hulu* court recently confirmed that the disclosure of an individual's PII along *is* itself the injury required by Article III. Beginning with the VPPA's text, the court noted that subsection (b) "refers to the 'aggrieved person' in the singular and precedes it with a definite article." *In re Hulu Privacy Litig.*, No. 11-cv-3764, 2013 WL 6773794, at *5 (N.D. Cal. Dec. 20, 2013). "Thus, the 'aggrieved person' is the consumer whose information was disclosed." *Id.* Rejecting the argument that some additional injury is required, the *Hulu* court explained that "[s]ubsection (b) does not refer to 'an aggrieved person' or 'any person aggrieved.'" *Id.* The consumer, therefore, is 'aggrieved' based solely on the disclosure of personally identifiable information to third parties and the video tape service provider is liable to that 'aggrieved person' for the relief in subsection (c)." *Id.*[11]

From this, the *Hulu* court recognized that "[t]he plain language of the statute shows that Congress considered a customer to be an 'aggrieved person' under the VPPA if a video tape service provider wrongfully discloses that consumer's personally identifiable information.'"

> The "any aggrieved person" language in subsection (c) establishes that any person who meets the definition of "the aggrieved person" in subsection (b)(2) (which demonstrated an injury in-fact for Article III

---

[11]    The VPPA's Senate Report also makes clear that "[i]n the event of an unauthorized disclosure, an individual may bring a civil action for damages," without any additional prerequisite to suit. S. Rep. 100-599, at *7.

> standing purposes) "may bring" a federal lawsuit. [18 U.S.C.
> § 2710(c)(1). The Court then "may award actual damages but not less
> than liquidated damages of $2,500." *Id.* § 2710(c)(2). Nothing in
> subsection (c) (or any other part of the statute) requires an injury
> *beyond* a violation of subsection (b).

*In re Hulu Privacy Litig.*, 2013 WL 6773794, at *5 (emphasis added).[12]

The authorities Dow Jones relies on do not require a different result. For example, Dow Jones argues that under *Sterk v. Best Buy Stores, L.P.*, No. 11-cv-1894, 2012 WL 5197901 (N.D. Ill. Oct. 17, 2012), Article III requires a VPPA plaintiff to allege some injury beyond the invasion of her vested legal rights. (MTD at 22.) But, the *Sterk* opinion is not helpful to Dow Jones for two reasons. First, it misapplies controlling Seventh Circuit precedent. Specifically, it relies on *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000), arguing that because the VPPA requires a plaintiff to be "aggrieved," "a plaintiff must plead an injury beyond a statutory violation to meet the standing requirement of Article III." *Sterk*, 2012 WL 5197901, at *6. However, *Kyles* holds exactly the opposite: when

---

[12]     Courts throughout the country have also routinely applied these principles to determine that violations of other consumer privacy statutes that authorize private lawsuits, like the VPPA, are sufficient to confer standing. *See, e.g., Graczyk v. West Pub. Co.*, 660 F.3d 275, 278 (7th Cir. 2011) (finding no monetary harm necessary to state a claim under the Driver's Privacy Protection Act, as "Congress has defined the relevant injury under the DPPA as 'obtain[ment], disclos[ure], or [use]'") (citation omitted); *Klimas v. Comcast Cable Comm.*, 465 F.3d 271, 275–76 (6th Cir. 2006) (finding standing where plaintiff alleged violations of the Cable Act's privacy provisions, with no claim of economic harm).

a statute grants a right to relief to an "aggrieved" party, a plaintiff "has standing to sue, *even if she has not been harmed apart from the statutory violation*." *Kyles*, 222 F.3d at 298 (emphasis added); *see also Akins*, 524 U.S. at 19–20.

Additionally, as explained by the *Hulu* court, the *Sterk v. Best Buy* decision is distinguishable on the facts, and "needs to be considered in," and limited to, its context. *In re Hulu Privacy Litig.*, 2013 WL 6773794, at *8. Most importantly, the *Sterk* court "found that Sterk had not alleged a disclosure and, therefore, must allege some other economic harm." *Id.* (citing *Sterk*, 2012 WL 5197901).[13]

"In sum, the *Sterk* Defendants challenged standing (and injury-in-fact) based on evidence that showed only a transmission of PII by wholly-owned subsidiaries to a parent company, and plaintiffs did not show any disclosure within the meaning of the VPPA and had no injury and no standing. *Sterk* does not support a conclusion that injury beyond disclosure is a prima facie element of a VPPA

---

[13] It also bears noting that the *Sterk* decision has been rejected within its own District. *See Sterk v. Redbox Automated Retail, LLC*, No. 11-cv-1729, 2013 WL 4451223, at *3 (N.D. Ill. Aug. 16, 2013) (noting that "[t]his Court previously decided that the VPPA creates [a legal right, the invasion of which creates standing] and that plaintiffs' claims adequately allege the defendant invaded that right," and holding that plaintiffs' allegations "that their privacy rights, recognized and protected by the VPPA, were violated when Redbox disclosed plaintiffs' PII to a third-party vendor without their consent . . . along with the evidence that plaintiffs have produced showing that the disclosure actually occurred, are sufficient to confer standing.").

claim." *In re Hulu Privacy Litig.*, 2013 WL 6773794, at *9 (citations omitted).

//

//

    **B**.   <u>Locklear Alleges that She *Was* Personally Identified as a Result of Dow Jones's Disclosures, She has Suffered Actual, Rather than Speculative, Injuries, and has Standing to Sue</u>.

Dow Jones is also mistaken in arguing that Locklear alleges only a speculative harm. (*See* MTD at 24.) As explained in section II.B above, Locklear expressly alleges that Dow Jones *actually disclosed* information about her in the form of her video viewing history and Roku serial number, that the information disclosed was PII, and that she was *in fact* identified as a result of that disclosure. (Compl. ¶¶ 53–61.) Thus, she does not merely allege that mDialog *could have* identified her in the future using the data Dow Jones disclosed; she alleges that mDialog *actually did* identify her. (*Id.*)

Dow Jones's cited authorities are inapposite on this point as well. (*See* MTD at 24.) First, Dow Jones cites *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) for the proposition that a "hypothetical" harm cannot establish an injury. *Id*. But, this Court need not determine whether Locklear's injury is a "hypothetical threat of future harm[,]" because she alleges that she *was* actually injured at the time Dow Jones disclosed her PII to mDialog. (Compl. ¶¶ 14, 41, 53–61.)

29

Therefore, Locklear's injury is "actual," rather than "theoretical" or "hypothetical" and *Clapper* is inapplicable here. (*See* MTD at 24); *see also Clapper*, 133 S. Ct. at 1147; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Dow Jones also cites *United States v. Weiss*, 467 F.3d 1300, 1311 (11th Cir. 2006) to support its argument that the "Eleventh Circuit has not squarely confronted this specific issue of whether mere statutory violation alone creates Article III standing[.]" (MTD at 23.) The *Weiss* court, however, *expressly held* that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Weiss*, 467 F.3d at 1311. Furthermore, to the extent the *Weiss* court found that the plaintiff there lacked standing it was because he did not have any interest in the property at issue—"[o]ne who has no interest of his own at stake always lacks standing"—not because it believed the violation of a statutorily-created right is insufficient to confer standing. *Id*. Accordingly, because Dow Jones does not dispute Locklear's interest in the privacy rights at stake, *Weiss* only confirms Locklear's standing. Accordingly, the Court should reject Dow Jones's arguments in this respect as well.

**CONCLUSION**

For the reasons stated above, Plaintiff Terry Locklear, individually and on

behalf of all others similarly situated, respectfully requests that this Honorable

Court deny Dow Jones's Motion to Dismiss and award such other relief as it deems

necessary, reasonable, and just.

Respectfully submitted,

**Terry Locklear**, individually and on behalf
of all others similarly situated,

Dated: July 21, 2014                    By:    s/ J. Dominick Larry
                                               One of Plaintiff's Attorneys

Jay Edelson (*pro hac vice*)
jedelson@edelson.com
Benjamin H. Richman (*pro hac vice*)
brichman@edelson.com
J. Dominick Larry (*pro hac vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

Jennifer Auer Jordan
Georgia Bar No. 027857
jennifer@thejordanfirm.com
THE JORDAN FIRM, LLC
1447 Peachtree Street, N.E., Suite 880
Atlanta, GA 30309
Tel: 404.445.8400
Fax: 404.445.8477

31

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D), the undersigned counsel for Plaintiff certifies that the pleading has been prepared in Times New Roman, 14-point type, which is of the font selections approved by the Court in Local Rule 5.1(B).

s/ J. Dominick Larry_____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 14, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/ J. Dominick Larry